# WHETHER SUBSECTION 104(b)(4) OF THE CLEAN AIR ACT PERMITS THE RECEIPT OF MONETARY DONATIONS

*Subsection 104(b)(4) of the Clean Air Act does not permit the EPA to accept and use donations of money.*

*Subsection 104(b)(4) of the Clean Air Act permits the EPA to accept items of personal property (other than money), such as an automobile, so long as the property in question would be received for use directly in the anti-pollution research authorized by section 104.*

December 8, 2009

## MEMORANDUM OPINION FOR THE GENERAL COUNSEL
## ENVIRONMENTAL PROTECTION AGENCY

Subsection 104(b)(4) of the Clean Air Act authorizes the Administrator of the Environmental Protection Agency ("EPA") to "acquire" various kinds of property by various means, including "donation," to further research relating to the "prevention and control of air pollution resulting from the combustion of fuels." 42 U.S.C. § 7404(a) & (b)(4) (2006). You have asked whether subsection 104(b)(4) permits the EPA to accept and use donations of money. For the reasons discussed below in part I, we conclude that it does not. You have also asked whether subsection 104(b)(4) permits the EPA to accept items of personal property (other than money), such as an automobile. For the reasons given below in part II, we conclude that it does, so long as the property in question would be received for use directly in the anti-pollution research authorized by section 104.

## I

Section 104 of the Clean Air Act is titled "Research relating to fuels and vehicles." It provides, in relevant part, as follows:

> **(a) Research programs; grants; contracts; pilot and demonstration plants; byproducts research**
>
> The Administrator shall give special emphasis to research and development into new and improved methods, having industry-wide application, for the prevention and control of air pollution resulting from the combustion of fuels. In furtherance of such research and development he shall—
>
> > (1) conduct and accelerate research programs directed toward development of improved, cost-effective techniques for--
> > > (A) control of combustion byproducts of fuels,
> > > (B) removal of potential air pollutants from fuels prior to combustion,
> > > (C) control of emissions from the evaporation of fuels,

> (D) improving the efficiency of fuels combustion so as to decrease atmospheric emissions, and
> (E) producing synthetic or new fuels which, when used, result in decreased atmospheric emissions.
> (2) provide for Federal grants to public or nonprofit agencies, institutions, and organizations and to individuals, and contracts with public or private agencies, institutions, or persons . . . ;
> . . . .

**(b) Powers of Administrator in establishing research and development programs**

In carrying out the provisions of this section, the Administrator may—

> (1) conduct and accelerate research and development of cost-effective instrumentation techniques to facilitate determination of quantity and quality of air pollutant emissions, including, but not limited to, automotive emissions;
> (2) utilize, on a reimbursable basis, the facilities of existing Federal scientific laboratories;
> (3) establish and operate necessary facilities and test sites at which to carry on the research, testing, development, and programming necessary to effectuate the purposes of this section;
> (4) *acquire* secret processes, technical data, inventions, patent applications, patents, licenses, and an interest in lands, plants, and facilities, *and other property* or rights by purchase, license, lease, or *donation*; and
> (5) cause on-site inspections to be made of promising domestic and foreign projects, and cooperate and participate in their development in instances in which the purposes of the chapter will be served thereby.

**(c)  Clean alternative fuels**

The Administrator shall conduct a research program to identify, characterize, and predict air emissions related to the production, distribution, storage, and use of clean alternative fuels to determine the risks and benefits to human health and the environment relative to those from using conventional gasoline and diesel fuels. The Administrator shall consult with other Federal agencies to ensure coordination and to avoid duplication of activities authorized under this subsection.

42 U.S.C. § 7404 (emphasis added).

In your view, "the word 'property' when included in a statute that authorizes agencies to accept donations, includes funds, money, or cash unless the statute excludes this form of

property from the reach of its gift acceptance authority." *See* Letter from Patricia K. Hirsch, Acting General Counsel, EPA, to Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel (December 15, 2008) at 2 ("EPA December Letter"). You note that this Office has read the phrase "other property" to include money in at least one instance. *See* EPA December Letter at 4 (citing 2 Op. O.L.C. 349, 352 (1977)). Thus, you believe the phrase "other property" in subsection 104(b)(4) should be understood to include money.

In June 2008, the Office of Management and Budget ("OMB") conveyed to your office a contrary position, based in part on what it contended would be the incongruous consequences that including money within the scope of subsection 104(b)(4) would have in light of the requirements of the Miscellaneous Receipts Act ("MRA"), 31 U.S.C. § 3302(b) (2006). In response to OMB's contentions about the MRA, you argue that subsection 104(b)(4) should be read as establishing an exception to the MRA. *See* EPA December Letter at 4-8.

We believe money is not included in the "other property" subsection 104(b)(4) authorizes the EPA to acquire, but in reaching this judgment we do not believe it is necessary to address the MRA. Instead, we reach this conclusion simply by examining the language of subsection 104(b)(4). When the phrase "other property" in subsection 104(b)(4) is considered in context, we believe it is clear that Congress did not intend to include money among the forms of property that the EPA can acquire for use in the research program authorized by section 104. While an administrative agency is generally entitled to deference in its interpretation of an ambiguous term in a statute it is charged with administering, "the question whether a statute is ambiguous arises after, not before a court applies traditional canons of interpretation—the most important here being the context in which the word appears." *OfficeMax, Inc. v. United States*, 428 F.3d 583, 592 (6th Cir. 2005). As the Supreme Court has explained, "[a]mbiguity is a creature not of definitional possibilities but of statutory context." *Brown v. Gardner*, 513 U.S. 115, 118 (1994); *see Chevron USA, Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843 n.9 (1984) (in determining whether congressional intent is clear courts must "employ[] traditional tools of statutory construction"); *California Indep. Operator Corp. v. FERC*, 372 F.3d 395, 400-401 (D.C. Cir. 2004) (rejecting agency's interpretation, and concluding that "practice" in section 206 of the Federal Power Act is not ambiguous when considered in context). Here, we think applying traditional tools of statutory construction demonstrates that "other property" in subsection 104(b)(4) is not ambiguous.

*First*, Congress has passed many statutes that authorize an agency to receive gifts of "money" in addition to authorizing the agency to receive gifts of "property." *See*, *e.g.*, 10 U.S.C. § 2601(a) (2006) (authorizing the Secretary of Defense or Homeland Security to "accept, hold, administer, and spend any gift, devise, or bequest of real property, personal property, or money"); 22 U.S.C. § 2395(d) (2006) (authorizing the President to accept "gifts, devises, bequests, grants, etc." of "money, funds, property, and services of any kind"); 22 U.S.C. § 2455(f) (2006) (authorizing the President to accept and use contributions of "funds, property, and services"); 22 U.S.C. § 5422(c)(1) (2006) (authorizing the Secretary of Labor to accept "any money or property, real, personal, or mixed, tangible or intangible, received by gift, devise, bequest, or otherwise"); 29 U.S.C. § 568 (2006) (authorizing the Secretary of Labor to accept and employ "any money or property, real, personal, or mixed, tangible or intangible, received by gift, devise, bequest, or otherwise"); 29 U.S.C. § 2939(b) (2006) (same); 22 U.SC. § 2056(b) (2006) (authorizing the Secretary of State to "accept from public and private sources money and

property" as "gifts, bequests, and devises"); 42 U.S.C. § 2476b(a) (2006) (authorizing the Administrator of the National Aeronautics and Space Administration to "accept gifts and donations of services, money, and real, personal, tangible, and intangible property"); and 42 U.S.C. § 7705c(a) (2006) (authorizing the Director of the Federal Emergency Management Agency to "accept and use bequests, gifts, or donations of services, money, or property"). These statutes, by specifically referencing "money" in addition to "property," demonstrate that Congress does not assume that the term "property" necessarily includes money or funds.

Moreover, even when Congress uses a general term, such as "any property," to characterize the types of property that an agency may receive, it sometimes spells out in a related statutory provision that money is among the types of property the agency may receive. *See*, *e.g.*, 28 U.S.C. § 524(d)(1) & (2) (2006) (authorizing the Attorney General to "accept, hold, administer, and use gifts, devises, and bequests of any property or services," and subsequently specifying how "[g]fits, devises, and bequests of money" shall be deposited in the Treasury and appropriated); 7 U.S.C. §§ 2264 & 2265 (2006) (authorizing the Secretary of Agriculture to "accept, receive, hold, and administer on behalf of the United States gifts, bequests, or devises of real and personal property . . . for the benefit of the National Agricultural Library," and subsequently specifying how "[a]ny gift of money accepted pursuant to the authority" shall be deposited in the Treasury and appropriated). These statutes show both that Congress has more than one way to indicate expressly that money is among the types of "property" that an agency may receive, and that the meanings of general terms such as "any property," "other property," or "property" need to be discerned by considering the surrounding statutory context.

This is not to say that Congress must expressly state in a gift acceptance provision or a related provision that money is among the types of property an agency may accept by donation in order for money to be included. Our 1977 opinion addressing the gift acceptance provision formerly codified at 40 U.S.C. § 298a (1976) (and now codified at 40 U.S.C. § 3175 (2006)) concluded that if Congress employs the term "property" in a context that indicates that its meaning is expansive enough to encompass money, an explicit invocation of the terms "money" or "funds" may not be necessary. 2 Op. O.L.C. at 352. But Congress's inclusion of an explicit reference to money in numerous statutes that also use the term "property" undermines, in our view, the position that "the word 'property' when included in a statute that authorizes agencies to accept donations, includes funds, money, or cash unless the statute excludes this form of property." EPA December Letter at 2.

*Second*, the immediate statutory context of the phrase "other property" in subsection 104(b)(4) indicates that it does not include money. *See*, *e.g.*, *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) ("the meaning of statutory language, plain or not, depends on context"); *id.* ("Words are not pebbles in alien juxaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used.") (quoting *NLRB v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir. 1941) (L. Hand, J.)). Section 104 is not a general gift acceptance provision that permits an agency to accept donations for any authorized purpose. *See*, *e.g.*, 29 U.S.C. § 568 (2006) (titled "Acceptance of donations by Secretary" and providing that "[t]he Secretary of Labor is authorized to accept, in the name of the Department of Labor, and employ or dispose of in furtherance of authorized activities of the Department of Labor, during the fiscal year ending

September 30, 1995, and each fiscal year thereafter, any money or property, real, personal, or mixed, tangible or intangible, received by gift, devise, bequest, or otherwise"). Rather, it permits acquisition of property only in order to facilitate a particular activity, namely, research to control air pollution resulting from the combustion of fuels. And consistent with that focused purpose, the words preceding "other property" in subsection 104(b)(4) indicate a limitation on the forms of property that may be "acquire[d]" pursuant to that subsection.[1]

The subsection states that the Administrator may acquire "secret processes, technical data, inventions, patent applications, patents, licenses, and an interest in lands, plants, and facilities." These detailed specifications would be unnecessary if the subsequent phrase "other property" was intended to include all types of property, including money. The list instead is best read to illustrate the types of property that may be received, types that are all distinguishable from money. Consistent with this purpose, the list that precedes the phrase "other property or rights" is narrowly focused on tools useful in research—various forms of intellectual property as well as space and facilities. Money, although always generally useful, is not in and of itself a research tool in the way that intellectual property—the specified "secret processes, technical data, inventions, patent applications, patents licenses"—and physical space and equipment— "an interest in lands, plants, and facilities"—are in and of themselves research tools.

This interpretation of subsection 104(b)(4) is reinforced by the canon of statutory construction *ejusdem generis*, which instructs that where "general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-115 (2001) (internal quotation marks omitted) (quoting 2A N. Singer, Sutherland on Statutes and Statutory Construction § 47.17 (1991)). For example, in *Washington State Department of Social & Health Services v. Keffeler*, the Supreme Court determined that the statutory phrase at issue, "other legal process," had to be read narrowly due to the words that preceded it. 537 U.S. 371, 383-84 (2003). *Keffeler* concerned the legality of a Washington State scheme whereby, for children under the State's foster care, the state credited Social Security benefits received on behalf of each of those children to a special account, and debited that account to pay foster care providers. Federal law protected those Social Security benefits from "execution, levy, attachment, garnishment, or other legal process." 42 U.S.C. § 407(a); *id.* § 1383(d)(1). The question before the court was whether "other legal process" covered Washington State's scheme. The Court concluded that it did not, even though the phrase at issue, "in the abstract," encompassed the contested activity. *Keffeler*, 537 U.S. at 383-84 ("[T]he case boils down to whether the department's manner of gaining control of the federal funds involves 'other legal process,' as the statute uses that term. That restriction to the statutory usage of 'other legal process' is important here, for in the abstract the department does use legal process as the avenue to reimbursement."). The Court found that "other legal process" needed to be read "far more restrictively" because it was limited by the terms that preceded it, "execution, levy, attachment, garnishment." *Id.* at 384-85. The Court looked at those preceding terms, identified a unifying theme, and read "other legal process" to mean "process much like the

---

[1] We are aware of two other statutes in the U.S. Code with the same phrasing as subsection 104(b)(4), both of which, like section 104, authorize scientific research on a particular subject. *See* 7 U.S.C. §§ 178g, 178h (2006). These statutes are administered by the Departments of Agriculture and Commerce. The General Counsel's Offices in both of those departments have informed us that they are unaware of either department acquiring any property under these statutes.

processes of execution, levy, attachment, and garnishment, and at a minimum . . . requir[ing] utilization of some judicial or quasi-judicial mechanism, though not necessarily an elaborate one, by which control over property passes from one person to another in order to discharge or secure discharge of an allegedly existing or anticipated liability." *Id.* at 385.

Applying the *ejusdem generis* canon to subsection 104(b)(4) supports the conclusion that "other property" does not include money. Like "other legal process," the term at issue in *Keffeler*, "other property" in subsection 104(b)(4) could, "in the abstract," shorn of context, encompass the contested thing. But nothing in the list that precedes "other property" looks anything like money. Instead, each item in the list that precedes it could be classified as a tool that the Administrator might need to acquire for direct use in research. There is no item on the list, for example, of general value, which might indicate that "other property" should encompass property not directly useful in research but indirectly useful as a funding source.

To be sure, subsection 104(b)(4) includes "donation" as one of the allowable ways of obtaining something useful in the authorized research. And, in the abstract, money may be received by donation. But we do not read the word "donation," in context, to indicate an expansive meaning of the term "other property." The word "donation," like the term "other property," does not stand alone. It appears in a list of specified means of acquisition that is exhaustive. That list reinforces our conclusion that the illustrative examples that precede "other property" indicate that money was not intended to be among the things that could be accepted as a gift. "[P]urchase, license, lease, or donation" are the four ways one can obtain tangible or intangible personal property, real property, or the rights to use intellectual property. Money uniquely cannot be purchased, licensed or leased. It would be anomalous to authorize the Administrator to "acquire" money by "purchase, license," or "lease." Thus, the inclusion of the word "donation" does not indicate that the word "property" should be read to include money. It is better read to denominate another means by which non-monetary types of property may be acquired.

In arguing that the term "other property" in subsection 104(b)(4) should be read to encompass money, your office notes that an earlier opinion by this Office addressing a different statute's use of the phrase "other property" could be read to encompass money. EPA December Letter at 6. A brief examination of the statute at issue in that earlier opinion, however, only supports our conclusion here.

In 1977, we concluded that 40 U.S.C. § 298a (1976) (now codified at 40 U.S.C. § 3175) allowed the Administrator of General Services ("GSA") to accept gifts of money. Our analysis, in its entirety, was as follows: "The statute applicable to GSA does not expressly mention gifts of money, but such gifts would appear to be included in the general phrase in 40 U.S.C. § 298a (1976), 'gifts of real, personal, or other property.'" 2 Op. O.L.C. 349, 352 (1977). At the time we wrote that opinion, 40 U.S.C. § 298a was titled "Acceptance of gifts of real, personal, or other property." Its entire text was as follows:

> The Administrator of General Services, together with the Postmaster
> General where his office is concerned, is authorized to accept on behalf of
> the United States unconditional gifts of real, personal, or other property in
> aid of any project or function within their respective jurisdictions.

Unlike the statutory text surrounding the term "other property" in subsection 104(b)(4), there is no context to limit the meaning of the term "other property" in former section 298a. On the contrary, the different preceding phrase in former section 298a, "unconditional gifts of real, personal," stands in contrast to the beginning of subsection 104(b)(4). First, it authorizes receipt of property by only one means, "gifts," *i.e.*, donation. That is consistent with the inclusion of money in the forms of property authorized to be accepted and contains none of the limiting implications of "acquire . . . by purchase, license, lease" in subsection 104(b)(4). Second, the terms "real" and "personal" are general and encompassing, again unlike the much more specific types of property interests identified in subsection 104(b)(4), "secret processes, technical data, inventions, patent applications, patents, licenses, and an interest in lands, plants, and facilities." All property, of any kind, is either "real" or "personal," including money. *See*, *e.g.*, Black's Law Dictionary 1254 (8th ed. 2004) (defining "personal property" as "[a]ny movable or intangible thing that is subject to ownership and not classified as real property").[2] Our conclusion that the phrase "other property" should be interpreted differently in subsection 104(b)(4) and in former section 298a, then, flows naturally from the starkly different statutory contexts in which the phrase appears.

We have also examined the legislative history of section 104, but we think it sheds no light on the question before us. The legislative history contains no discussion of the meaning of the term "other property," nor does it address what the drafters meant by their use of the terms "acquire" or "donation." As the EPA acknowledges in its December 15, 2008 letter, the legislative history contains "no specific discussion of what Congress intended by the phrase 'and other property.'" EPA December Letter at 3. The two places in the legislative history to which the EPA draws attention in its letter are inconclusive at best, and primarily can be read to indicate that Congress was focused on empowering the EPA Administrator to obtain the tools necessary for the relevant research programs, not on validating a general gift or donation statute.

First, the EPA notes that the original Senate Report on the bill that included section 104 stated that "the Secretary is directed to . . . acquire property and rights by various means." EPA December Letter at 3 (citing S. Rep. No. 90-403, July 15 1967, at 41). The use of the term "property" without explanation or elaboration sheds no light on whether it includes money. In a preceding paragraph, the Report characterizes section 104's purpose as "requir[ing] the Secretary to give special emphasis to research into new methods for the control of air pollution resulting from fuel combustion." S. Rep. No. 90-403, at 41 (1967). The reference to the Secretary's direction to "acquire property and rights by various means" appears in a list of the Secretary's obligations "[i]n order to carry out the provisions of this section." *Id.* The Secretary "is directed to conduct research and development of low-cost instrumentation techniques to determine the quantity and quality of air pollution emissions; make use of existing Federal laboratories; establish and operate facilities to carry out the research; acquire property and rights by various means, and cooperate and participate in the development of foreign and domestic projects." *Id.* Every element of this passage indicates that Congress's focus was on the research itself, and on the acquisition of the tools necessary to accomplish the research, rather than on the types of

---

[2] In fact, in 2002 Congress amended 40 U.S.C. § 298a to replace "real, personal, or other property" with the simple term "property" because the phrase "real, personal, or other" was "unnecessary." H.R. Rep. No. 107-479, at 57 (2002).

property the EPA could acquire. No reference is made to donations or gifts. The statement that the Secretary is directed "to acquire property by various means" demonstrates, at most, that Congress intended to broadly empower the acquisition of the necessary property, not that Congress intended such property to include money.

Second, the EPA points to a comment in another Senate Report issued when Congress amended section 104 to increase appropriations. In that Report, the Committee on Public Works expresses an expectation that "projects involving cost sharing by industry will account for an increasing share of the [research and development] program in the months and years ahead, particularly in the area of prototype testing." S. Rep. No. 91-286, at 6 (1969). This statement, like the one in the earlier Senate Report, in no way suggests an intent to enable the EPA Administrator to receive and use donated funds. Nowhere does the Report state that such "cost sharing" shall occur by the donation of private funds to the EPA. In fact, other parts of the Report indicate that such cost sharing would be achieved through the sharing of real and intellectual property, the kinds of "property" specified in subsection 104(b)(4). For example, the Report notes that "section 104 allows for the construction and testing of demonstration control equipment on private property. The consequence is to ease the legal problems associated with supporting large-scale development and demonstration projects involving construction on private property. The construction and operation of demonstration plants at industrial sites is often the best means of making a realistic evaluation of the economic and technical feasibility of new processes." *Id.* at 5. This passage fits with subsection 104(b)(4)'s statement that the Administrator may "acquire . . . an interest in lands, plants, and facilities." Similarly, in the paragraph following the statement about cost-sharing quoted by the EPA, the Report notes that "[a]greements regarding the handling of proprietary information have been negotiated to pave the way for evaluation of flue-gas treatment processes developed by Wellman-Lord and the Monsanto Co." *Id.* at 7. This passage fits with subsection 104(b)(4)'s authorization of the Administrator to "acquire . . . patents, licenses."

Considering both the immediate context in which "other property" appears in subsection 104(b)(4) and the broader context of other statutes authorizing agencies to accept donations, we believe Congress did not intend to authorize the EPA to accept monetary donations when it authorized the acquisition of certain types of property in subsection 104(b)(4).

**II**

In a follow-up letter, dated May 29, 2009, your office has asked us to address a related question, whether "other property" in subsection 104(b)(4) includes items of personal property other than money, such as an automobile. *See* Letter from Patricia K. Hirsch, Acting General Counsel, EPA, to David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel (May 29, 2009) at 1 ("EPA May Letter"). We conclude that it does.

As our discussion in part I indicates, we believe that, under the *ejusdem generis* canon, the term "other property" in subsection 104(b)(4) is constrained by the items in the list that precedes it. While many of those items are forms of intangible property, such as various kinds of intellectual property, not all of them are. Among the types of property that may be acquired are "lands, plants, and facilities." Admittedly, the reference to those forms of property is prefaced by "an interest in." 42 U.S.C. § 7404(b)(4). But fee simple ownership is one type of property

interest.  And, in any event, as explained above, this list identifies types of property that are all tools directly useful in executing the anti-pollution research authorized by section 104.  In particular, the term "facilities" is quite broad, and would appear to cover a research lab and relevant research equipment.  Personal property, moreover, may not only be acquired by donation, but also by purchase, license, or lease.  Therefore, we believe that property that would be used directly in the anti-pollution research authorized by section 104 falls within the scope of property that can be acquired pursuant to subsection 104(b)(4).  With this understanding of the term "property" in mind, certainly an automobile could fall under the term if, for example, it were acquired to test its emissions or even if it were acquired to shuttle equipment between research facilities.

For the foregoing reasons, we conclude that subsection 104(b)(4) of the Clean Air Act does not authorize the receipt and use of donated money but does authorize the EPA to receive personal property that does not fall into one of the specifically enumerated categories so long as it is for use directly to carry out the anti-pollution research authorized by section 104.

/s/

JONATHAN G. CEDARBAUM
Deputy Assistant Attorney General